[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action by a landlord for rent claimed due under a lease and for property damage allegedly caused by the defendants. The plaintiff also seeks attorney fees and interest as provided by the applicable lease.
In their answer, the defendants assert three (3) special defenses. They claim they were constructively evicted, that the plaintiff failed to use reasonable efforts to re-rent, and that he is equitably estopped with regard to any rent paid by a subsequent tenant. The defendants also assert a counterclaim which pleads their full compliance with the lease, the plaintiffs noncompliance, and their entitlement to twice the amount of the security deposit under C.G.S. § 47a-21.
Hearings were held on August 7, 1998, December 18, 1998, and April 7, 1999, at the conclusion of which the plaintiff submitted proposed orders and the defendants submitted a trial brief regarding damages.
FACTUAL BACKGROUND
The plaintiff owns residential property consisting of three (3) apartments at 246-248 Harwinton Avenue in Torrington, Connecticut.
The defendants (then known as Blass and Carbone) first occupied the first floor apartment under a lease which ran from April 1, 1995, to March 31, 1996 (Plaintiffs Exhibit #1). Rent was $475.00/month and the plaintiff received a security deposit in the same amount. Occupancy during that period was generally uneventful though there was testimony by the landlord of damage CT Page 7180 to a door requiring replacement at a cost of $75.00.
The lease was renewed with a term beginning April 1, 1996, and ending March 31, 1997 (Plaintiffs Exhibit #2). Monthly rental continued in the same amount. Rent continued to be timely paid and there existed no conflict between the parties until June of 1996 when the landlord testified Ms. Carbone called to ask for permission to park a mobile home on the property, a request the plaintiff denied. The landlord further testified Ms. Carbone told him she had entered the basement, had observed and photographed unsafe wiring as a result of the jumpering of wires (by the use of alligator clips) from the second floor utility panel to that of the third floor panel, and that, if the plaintiff did not agree to the parking of the mobile home on the property, she would inform the local building inspector of the condition and request that person inspect the basement. The landlord stated the tenant had no permission to enter the basement and had in fact broken into the cellar to accomplish her photography. That, however, is at odds with his later testimony that the tenants had permission to there keep an aquarium and gym equipment. Ms. Carbone's testimony (By the time of the hearing on December 18, 1998, the tenants had married and Ms. Carbone was then known as Mrs. Blass.) was that she merely pushed further open the basement door which was already opened. The landlord admitted he jumpered the wires for the accommodation of the third floor tenant who was without a hallway light but he insisted this wiring condition existed for three (3) days only before CLP came to connect the power.
Plaintiffs Exhibit #11, a letter from Francis Cardello, Jr., a Torrington building official, established Mrs. Blass had registered a complaint with the town's building department and had caused an inspection by Mr. Tom Reagan, an electrical inspector for the town, sometime in June of 1996. He observed no evidence of the jumpering of wires and it is therefore clear the problem was corrected within a short time of Mrs. Blass' call. The same exhibit established Mrs. Blass again called the building department in early July to complain of various housing violations specifically, the failure to replace bathroom ceiling panels, the need to re-caulk the area around the bathtub, a kitchen ceiling and walls in disrepair, electrical switches in the kitchen and rear bedroom needing replacement, and the need to repair a front door which did not close properly. Mr. Cardello inspected the apartment on July 10, 1996 (See Plaintiffs Exhibit #11.), and, thereafter, the landlord wrote his tenants citing CT Page 7181 various housing and/or city violations he and the building inspector found within the apartment — i.e., blocked doorways, a barbecue grill on the front porch railing, the mobile home parked on the sidewalk, the presence of cats in violation of the lease, damage to screens (allegedly caused by the cats) in the kitchen and front bedroom, and the storage of items in a garage without the plaintiffs knowledge. It was not made clear whether the tenants ever responded to the plaintiffs complaints but there was testimony the conditions the defendants asked be corrected were in fact addressed and this is further corroborated by the tenants' payment of rent for July, August, September, and October, 1996.
In a letter dated October 1, 1996, but which the plaintiff testified he did not receive until October 18th, the defendant wife informed the plaintiff they would be vacating the apartment by November 1st. The critical language contained therein is, "We had intended to stay untill (sic) our lease ran out in March and get another apartment, but we bought a house instead. Sorry for any inconvenience." Plaintiffs Exhibit #5. The defendants' home purchase was consummated on October 31, 1996 (Plaintiffs Exhibit #10), and the defendants left the apartment on November 2, 1996. Thereafter, on November 15th, the plaintiff wrote the defendants demanding rent payment for the five (5) months remaining under the lease less the tenants' security deposit — for a total of $1,900 (Plaintiffs Exhibit #6). No reference was made to damages within the apartment though the landlord had then had thirteen (13) days to inspect. On November 27,th, twenty-five (25) days after the defendants had vacated, the plaintiff wrote his former tenants demanding payment of $1,700.72 for damages and attached a closing statement (Plaintiffs Exhibit #7). At a hearing on December 18, 1998, the plaintiff submitted another damages statement — this one for $1,893.03 — and attached receipts for payments for repair services performed and replacement items purchased. The plaintiffs proposed orders of April 9, 1999, included a claim for damages in the amount of $2,053.16.
The plaintiffs total claim for damages — to include unpaid rent, property damage, attorney fees and interest and applying the credit of the security deposit — is $6,196.93.
The defendants' claim the total amount of damages is $173.89 as follows:

CT Page 7182 Repair of strip of counter-top: $25.00
Carpet cleaning: $58.00
Stove knobs: $4.23
Window screens: $80.56
One cellar window: $6.10
In their trial brief of December 18, 1998, and at the final hearing on April 7, 1999, the defendants abandoned their claim that twice the amount of the security deposit be paid, claiming they are owed $301.11 (security deposit of $475 minus damages of $173.89).
FINDINGS
Having heard and considered the testimony, reviewed the exhibits and the papers submitted by the parties, and having evaluated the credibility of the witnesses, the following findings are made.
1. The defendants have not established constructive evictionand are liable to the plaintiff for unpaid rent for those monthsin which the landlord made reasonable but unsuccessful attemptsto re-rent.
Constructive eviction arises when a landlord, while not actually depriving the tenant of possession of any part of the premises, has done or suffered some act by which the premises are rendered untenantable and has thereby caused a failure of consideration for the tenant's promise to pay rent. Conference Center Ltd. v. TRC, 189 Conn. 212, 220 (1983), citing Amsterdam Realty Co. v. Johnson, 115 Conn. 243, 248 (1932). In addition to proving the premises are untenantable, a party pleading constructive eviction must prove: 1) the problem was caused by the landlord; 2) the tenant vacated because of the problem; and 3) the tenant did not vacate until after giving the landlord reasonable time to correct the problem. Thomas v. Roper,162 Conn. 343, 349 (1972).
Whether the premises are untenantable is a question of fact for the trier to be decided in each case after a careful consideration of the situation of the parties to the lease, the CT Page 7183 character of the premises, the use to which the tenant intends to put them, and the nature and extent to which the tenant's use of the premises is interfered with by the injury claimed. Id. at 347.
Here, the condition claimed is the jumpering of wires between the second and third floor panels in the basement. Francis Cardello, town building inspector, visited the premises in either June or July of 1996 (Mr. Cardello's testimony was conflicting in that regard though it would appear he went in July and Thomas Reagan, the town's electrical inspector, went in June of 1996.). On April 7, 1999, he testified the jumpering of wires as here done was hazardous in that there could be arcing from the clips used and someone in the area could as a result be electrocuted. Clearly this is the kind of threat to tenants' safety which may render the premises uninhabitable. There was, however, no evidence adduced to support a finding this act by the landlord posed a genuine threat to these first floor tenants with limited access to the basement. It is clear neither the building nor the electrical inspector issued the landlord a citation and that the condition persisted only a few days. Whether the existence of that condition was sufficient to permit a withholding of rent for June of 1996 is not here relevant since rent was paid in that and the four succeeding months. That this condition was not the cause of the tenants' move was demonstrated by their rent payment in those months, Mr. Blass' purported comment to the plaintiff in June that the plaintiff should not "worry" (Though Mr. Blass was present at each hearing, he never testified.), and, most persuasively, by the defendant wife's letter of October 1, 1996, which made no reference to this or any of the other conditions she claimed rendered the premises uninhabitable. The tenants, having apologized in writing for inconvenience caused the plaintiff for moving out with five (5) months to go on the lease, cannot now claim they abandoned the premises because the wiring — a condition corrected over three months earlier — was too serious a threat to their well-being to continue to live there. The tenants moved for no reason other than that they had found a house to buy.
The defendants' claim they were constructively evicted because the furnace was not in good working condition (didn't provide sufficient heat) is equally unpersuasive. Assuming argued the truth of Mrs. Blass' testimony that they were without heat the first couple of nights after they moved in April of 1995, that the hot water ran out halfway through a shower, and that CT Page 7184 they put plastic over their windows in the winter to keep the cold out, their renewal of the lease the following year dictates a finding they did not vacate for reason of the furnace and that finding is underscored by the landlord's testimony the tenants declined his offer to turn the heat on in September of 1996.
Finally, the defendants claimed they were constructively evicted as a result of the defendant's failure to maintain the bathroom ceiling, which failure resulted in a hole in the ceiling that permitted a sight line from the second floor bathroom to the first floor bathroom. Though Ms. Carbone formally complained of this and other items needing repair in her letter of July 10, 1996 (Plaintiffs Exhibit #4) and though such letter threatened to withhold rent in August, the landlord's testimony the enumerated items were repaired was not contradicted and the August rent (as well as rent for subsequent months) was paid.
2) From November of `96 to February of `97. the landlord usedreasonable efforts to rent the premises following the defendants'abandonment of the apartment.
The landlord presented receipts from the local newspaper to support his effort to mitigate damages. His testimony and Plaintiffs Exhibit #9 established he ran ads in search of a new tenant beginning November 20, 1996, and ending February 4, 1997. While it is reasonable to conclude the premises were not ready to be advertised until November 20, 1996 (The defendants did not vacate until November 2nd and time was required to ready the premises for a new tenant.), no explanation was offered with regard to the plaintiffs failure to advertise in March of 1997. In the absence of any testimony to support a finding the landlord made other efforts to re-rent in that month, the failure to then advertise is a failure to mitigate.
The defendants are therefore liable to the plaintiff for four (4) months of unpaid rent.
3) The defendants cannot prevail on their claim of equitableestoppel for any amount a subsequent tenant has paid or isrequired to pay the plaintiff for use of the premises.
The landlord's unrefuted testimony was that the apartment was not again rented until September of 1997; thus, equitable estoppel cannot be established when the plaintiff received no rent for the period remaining under the second lease. CT Page 7185
4) The defendants are liable to the plaintiff for propertydamage they negligently caused in the amount of $575.53.
C.G.S. § 47a-11(f) provides a tenant may not wilfully or negligently destroy, deface, impair or remove any part of the premises or permit any other person to do so. The mere fact of damage does not create liability. Proof of wilful or negligent damage requires evidence by the landlord who has the burden of proof on all elements of a damage claim. The plaintiff must not only prove the source of the damage but that it exceeded normal wear and tear. DiBiaso v. Gargiulo, 193 WL 307678 (Conn. Super) (citations omitted). A tenant is not liable for damage existing when he moved in. Slaughter v. McFarlane, NH-583 (1992). Nor is he liable for "normal" or reasonable wear and tear. Dell'Oro v.Kelly, SNBR-384 (1992). In general, wear and tear — as distinct from property damage — is deterioration of property over and above that to be expected from normal usage. It includes normal cleaning and polishing and repainting at the And of a tenancy. Property damage may be measured by repair cost or value. Replacement cost is not usually allowed. Thus, if a tenant destroys a carpet, his liability must be adjusted for the age and condition of the carpet since the tenant is liable only for lost value. Di Biaso, supra, at 4. If damage is repaired as part of a larger repair or improvement job, the tenant is liable only for that portion of the repair caused by his wilful or negligent conduct and the landlord's evidence must provide a method by which the court can determine the appropriate allocation to the tenant. Id. at p. 5.
As earlier noted, the plaintiffs claim for damages grew — inexplicably — as time passed. Relevant to his claim is the degree of care the defendants took of their apartment. On the one hand, Diane Pappalardo, who regularly performed domestic cleaning for the landlord,[1] testified the condition of the Blass apartment when they vacated was "very, very dirty — almost deplorable" and that, though it normally required no more than three (3) hours to clean an apartment, she and a helper were forced to expend twenty (20) hours cleaning this apartment at the rate of $10.00/hour. Plaintiffs Exhibit #8 includes a charge of $206.67 attributable to that effort (The additional amount represents materials.). She described "filthy" walls, grease covering the stove top, broken and dirty window shades, cigarette bum holes on linoleum, and radiators clogged by batteries, a doll's head, and cigarette butts. On the other hand, Mrs. Blass CT Page 7186 testified she gave the apartment a thorough cleaning before vacating. Mr. Cardello testified, with regard to his July, 1996, visit and inspection of the kitchen, bathroom, and one (1) bedroom, the apartment was "well-kept" and "very neat." In fact, on re-cross-examination, the plaintiff who testified he had been in the apartment during the defendants' tenancy, stated he had once considered them to be two of his best tenants and that he had never had reason to write the couple before his letter of July 10, 1996.
The court rejects some of the plaintiffs claims as untimely made and/or as attributable to normal wear and tear. Some of the expense items for which reimbursement is sought are rejected as simply not credible. For example, with regard to the former category, Plaintiffs Exhibit #3 (the plaintiffs "closing statement" dated November 27, 1996 — a full twenty-five (25) days after the defendants had vacated) makes no reference to the need to remove the toilet for repair to bathroom flooring; re-painting of the apartment had last been done in November of 1993 and is not an unusual expense to incur at the end of a tenancy; replacement of an entire counter-top — which allegedly also required removal of the sink — particularly when there was evidence the old counter-top was worn and had scratches and only a 6" strip of the top was damaged by these defendants is unreasonable. Refrigerator repair costs were not proven to be as a result of anything other than wear and tear. The cost of new carpeting and new tile (as opposed to linoleum) is unsupported by the photographic evidence and is excessive when it is considered the landlord also claims the cost of the cleaning of carpets. These represent a betterment of the landlord's property. With regard to the latter category, the court rejects the claim of the cost of a wrench as a tool required by all homeowners and as petty the claimed cost of a new sink drain particularly in the absence of any damage claimed to have inflicted by the tenants. The claimed cost of replacing a surveyor pin ($125) is based on speculation, the only proffered evidence consisting of the plaintiffs having seen the tenants' son playing in the area of the pin the day preceding the alleged discovery of the missing pin.
Taking into account the defendant wife's testimony of damage inflicted by her family, having observed the demeanor and credibility of the witnesses, and having reviewed the plaintiffs damage exhibits as against the testimony, the following damages are awarded: CT Page 7187
Counter top replacement $50.00
Shades and brackets $141.88
Linoleum installation $165.00
Screen door replacement $14.84
Door replacement $75.00
Apartment cleaning $50.00
Carpet cleaning $58.00
Replacement of stove knobs $15.25
Window screens $80.56
TOTAL: $573.53
CONCLUSION
Judgment shall enter for the plaintiff on his complaint and for the defendant on the counterclaim as follows:
Unpaid rent $1,800.00
*Net Damages $100.53
 Attorney's Fees (15% of above per lease) $285.08
Interest at the rate of 12% per annum (per lease) is due on the principal amount of $1,900.53 (unpaid rent plus net damages) for the period beginning November 1st of 1996 (when the tenants first failed to pay rent) and ending April 7, 1999 (last trial date). That amount is to be calculated by the parties.
Sheedy, J. CT Page 7188